Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL VII

| JAMES VILLANUEVA GONZÁLEZ *Recurrente* v. DEPARTAMENTO DE CORRECCIÓN Y REHABILITACIÓN *Recurrido* | TA2026RA00176 | Revisión Administrativa procedente del Departamento de Corrección y Rehabilitación Sobre: Evaluación de Custodia |
|---|---|---|

Panel integrado por su presidente, el Juez Rodríguez Casillas, la Juez Barresi Ramos y la Jueza Santiago Calderón

Santiago Calderón, Jueza Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 26 de mayo de 2026.

El 2 de abril de 2026, el señor James Villanueva González (señor Villanueva González o recurrente) presentó ante este Tribunal de Apelaciones, por derecho propio, el recurso de *Revisión Administrativa* de epígrafe acompañado de una *Solicitud para Declaración de Indigencia.*

Examinada la solicitud para litigar como indigente, la declaramos **Ha Lugar** el 17 de abril de 2026**.**

En cuanto al recurso de *Revisión Administrativa,* por los fundamentos que expondremos a continuación, ***confirmamos*** la *Resolución de Hecho y Derecho*[1] impugnada.

**I.**

El caso de autos tuvo su génesis el 26 de febrero de 2026, cuando el señor Villanueva González se reunió con el Comité de Clasificación y Tratamiento de la Institución Máxima Seguridad de Ponce para una evaluación de custodia. Ese mismo día, luego de evaluar el expediente social y criminal del recurrente, el Departamento de Corrección y Rehabilitación (DCR o recurrido)

---

[1] Apéndice 3 del recurso de *Revisión Administrativa,* págs. 8-14.

emitió una *Resolución de Hecho y Derecho* en la que realizó las siguientes Determinaciones de Hechos:

El Sr. James Villanueva Gonzalez, con Auto de Prisión Provisional dictada el día 30 de noviembre de 2017, por el Honorable Tribunal de Aguadilla para que responda a los casos por lo que se imputan de; **Art. 93 (A) C. P.** (Asesinato en 1er. Grado), con una fianza de $1,500, 000.00, **Tent. Art. 93 (A) C. P.** (Tentativa de Asesinato en 1er grado), con una fianza de $1, 500,000.00, **Art. 5.04 L. A.** (Posesión y uso de arma blanca), con una fianza de $500,000.00 y **Art. 5.15 L. A.** (Disparar o apuntar armas) con una fianza de $500,000.00, para un total de $4,000,000.00 en fianzas. Con el Núm. Querella: **2017-10-13-08394** en todos los casos. Por hechos cometidos en la vecindad del pueblo de Aguadilla P. R., el día 6 de noviembre de 2017. El acusado, fue sentenciado el día 19 de julio de 2019, por el Honorable Tribunal de Aguadilla a cumplir una pena de reclusión por los delitos de; **Art. 93 (A) C. P.** (Asesinato en 1er grado) con Núm. Criminal **AVI2019G0005** a **99 años** de reclusión a cumplirse concurrente con Tent. Art. 93 (A), y consecutivo con Art. 5.04 L. A. y Art. 5.15 L. A. **Tent. Art. 93 (A) C. P.** (Tentativa Asesinato en 1er grado) con Núm. Criminal **AVI2019G0005** a **20 años** de reclusión y a cumplirse concurrente con el Art. 93 (A) C. P. **Art. 5.04 L. A.** (Posesión y uso de arma blanca) con Núm. Criminal **ALA2019G0005** a 10 años de reclusión y por la disposición de Ley, la pena seria doble (**10 x 2 = 20 años de reclusión**), a cumplirse consecutiva con los casos Art. 93 (A) C. P., Tent. Art. 93 (A) C. P. y **Art. 5.15 L. A.** Art. 5.15 L. A. Grave 2000 (Disparar o apuntar armas) con Núm. Criminal: **ALA2019G0006** a 5 años de reclusión y por disposición de Ley, la pena seria doble **(5 X 2 = 10 años de reclusión)** y a cumplirse consecutivo con los casos Art. 93 (A) C. P., Tent. Art. 93 (A) C. P. y Art. 5.04 L. A, para un total 129 **años** de reclusión.

- Confinado comenzó [a] cumplir sentencia el 19 de julio de 2019. Por los siguientes delitos Art. 93, Tent 93, Art 5.041LA, Art 5.105LA.
- El mínimo está pautado para el 6 de diciembre de 2043, la sentencia la dejar[á] extinguida el 7 de agosto de 2147.
- No cuenta con casos pendientes de resolver.
- No posee con antecedentes penales.
- Ha cumplido 7 años, 2 meses y 7 días del total de la sentencia impuesta.
- Se clasific[ó] inicialmente en custodia máxima el 8 de agosto de 2019(por la gravedad de los delitos cometidos).
- El 7 de febrero de 2020 sale incurso en querella #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 nivel 1 cód. 115(agresión o su tentativa).
- El 23 de julio de 2020 fue evaluado por Physician Correctional donde determinaron que no amerita las Terapias de Trastornos adictivos.
- El 25 de agosto de 2020 se ratifica la custodia máxima) por incurrir en actos de indisciplina cód. 115(agresión o su tentativa).
- El 17 de febrero de 2021 y el 18 de agosto de 2021, abril 2022, agosto 2022, febrero/2023, se ratifica la custodia máxima, con fundamentos similares tales como; (Según el Manual de Clasificación de

Confinados establece que todo confinado con sentencia de 99 años o más y clasificados en custodia máxima como resultado de la sentencia, permanecerán en dicha custodia por cinco (5) años incluyendo el tiempo cumplido en preventiva). Al momento continua con el mismo nivel de custodia actual.

- El 20 de octubre de 2021 complet[ó] las terapias de Control de Impulsos.
- Cuenta con cuarto año de escuela Superior, actualmente se encuentra participando del curso vocacional sistema de Oficina con buenas evaluaciones.
- Complet[ó] las Terapia de control de Impulsos el 20 de octubre de 2021.
- El 21 de junio de 2022 se le realiz[ó] prueba de dopaje donde el resultado obtenido fue negativo.
- El 10 de enero de 2023 salió incurso en querella nivel1 #310-33-95 cod.108 (posesión; introducción, distribución, uso, venta de introducción de teléfono, celulares o equipo de telecomunicaciones).
- El 18 de enero de 2024, fue integrado en el curso Proyecto de jardinería comercial y residencial, inserción mundo laboral, completó el mismo [el] 8 de marzo de 2024, en la institución Ponce máxima Seguridad.
- El Confinado fue evaluado por la Dra Ramírez el 9 de abril de 2025 donde determin[ó] no incluirlo en las terapias de RCCI, toda vez que se encontraba integrado en las terapias de SEA.
- El 28 de febrero de 2024 se asigna a realizar labores de lavandería B5 obteniendo evaluaciones buenas por su trabajo. Posteriormente el 25 de febrero de 2025 se dio de baja de lavandería y se asigna a ordenanza.
- Complet[ó] la Terapia de SEA el 3 de junio de 2025[2]. (Énfasis suplido).

En vista de lo anterior, el DCR determinó ratificar la custodia máxima. Inconforme, el 4 de marzo de 2026, el recurrente comenzó un *Proceso de Reconsideración Sobre Clasificación de Custodia*[3]. En el mismo, arguyó que él solo había incurrido en dos (2) querellas disciplinarias en lo que llevaba de su sentencia. Asimismo, esbozó que su prueba de dopaje había arrojado resultados negativos, y que en los últimos años, había obtenido sentido de responsabilidad al mantener una conducta positiva y estable. De igual forma, señaló que había tomado ciertos cursos con evaluaciones satisfactorias.

---

[2] *Íd.*, págs. 8-9.
[3] *Íd.*, págs. 1-7.

Por su parte, el recurrido no se expresó en torno a la reconsideración. Es por ello que, el 2 de abril de 2026, el señor Villanueva González acudió ante este foro intermedio y solicitó que se ordene al DCR otorgar la reclasificación de su custodia a mediana.

El 17 de abril de 2026, emitimos una *Resolución* en la cual le concedimos al DCR hasta el 1 de mayo de 2026 para presentar su alegato. En cumplimiento con lo anterior, el DCR sometió su *Escrito en Cumplimiento de Resolución* según ordenado.

Con el beneficio de la comparecencia de ambas partes, procedemos a resolver.

**II.**

**-A-**

La Ley de la Judicatura del Estado Libre Asociado de Puerto Rico establece la autoridad del Tribunal de Apelaciones para revisar "decisiones, órdenes y resoluciones finales de organismos o agencias administrativas"[4]. Por su parte, la Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico (LPAU) establece el marco de revisión judicial de estas decisiones[5]. Cónsono con lo anterior, nuestra función revisora se limita a delinear la discreción de las entidades administrativas para garantizar que sus decisiones se encuentren en el marco de los poderes delegados y sean consecuentes con la política pública que las origina[6].

Debido a la vasta experiencia y conocimiento especializado que tienen las agencias administrativas sobre los asuntos que le son encomendados, los foros revisores les conceden gran consideración

---

[4] Art. 4006(c) de la Ley Núm. 201-2003, 4 LPRA sec. 24(y)(c).
[5] Sección 4.5 de la Ley Núm. 38-2017, 3 LPRA sec. 9675.
[6] *Torres Rivera v. Policía de PR*, 196 DPR 606, 625-626 (2016); *Empresas Ferrer v. A.R.Pe.*, 172 DPR 254, 264 (2007); *Mun. de San Juan v. J.C.A.*, 149 DPR 263, 279 (1999).

y deferencia a sus decisiones[7]. Al mismo tiempo, esta facultad revisora delimita la discreción de los organismos administrativos a modo de asegurar que estos ejerzan sus funciones dentro de los márgenes de las facultades que le fueron delegadas por ley[8]. Es por esta razón, que la revisión judicial se limita a determinar si la agencia actuó de manera arbitraria o ilegal, o de forma tan irrazonable que sea considerado un abuso de discreción[9]. Hay que señalar que las determinaciones de los organismos administrativos están cobijadas por una presunción de corrección y legalidad que debe respetarse, mientras la parte que las impugne no demuestre con suficiente evidencia que la decisión no está justificada[10].

Así pues, la revisión judicial de una decisión administrativa se circunscribe a determinar si hay evidencia sustancial en el expediente para sostener la conclusión de la agencia o si esta actuó de forma arbitraria, caprichosa o ilegal[11]. El criterio rector es la razonabilidad de la actuación de la agencia recurrida[12]. Por ello, al momento de evaluar una determinación administrativa se debe considerar si: (1) el remedio concedido por la agencia fue apropiado; (2) la decisión de la agencia está sostenida en evidencia sustancial que obra en el expediente administrativo visto en su totalidad; y (3) las conclusiones de derecho fueron correctas[13].

Ahora bien, si la decisión del organismo administrativo no estuvo basada en evidencia sustancial; erró en la aplicación o

---

[7] *Super Asphalt v. AFI y otro*, 206 DPR 803, 819 (2021); *OCS v. Point Guard Ins.*, 205 DPR 1005, 1026 (2020); *PRHOA v. Confederación Hípica*, 202 DPR 509, 521 (2019).

[8] *Vázquez v. Consejo de Titulares y Junta de Directores del Condominio Los Corales*, 2025 TSPR 56, 215 DPR ___ (2025).

[9] *Pérez López v. Depto. de Corrección*, 208 DPR 656, 673 (2022); *Super Asphalt v. AFI y otro*, *supra*, pág. 821; *Trigo Margarida v. Junta Directores*, 187 DPR 384, 394 (2012).

[10] *Trigo Margarida v. Junta Directores*, *supra*, págs. 393-394; *Mundo Ríos v. CEE et al.*, 187 DPR 200, 219 (2012), citando a *Rebollo v. Yiyi Motors*, 161 DPR 69, 77 (2004).

[11] *Vélez v. A.R.Pe.*, 167 DPR 684, 693 (2006).

[12] *Super Asphalt v. AFI y otro*, *supra*; *González Segarra et al. v. CFSE*, 188 DPR 252, 276 (2013); *Trigo Margarida v. Junta Directores*, *supra*, pág. 394.

[13] *OEG v. Martínez Giraud*, 210 DPR 79, 89 (2022); *Rolón Martínez v. Supte. Policía*, 201 DPR 26, 35-36 (2018); *Pagán Santiago et al. v. ASR*, 185 DPR 341, 358 (2012).

interpretación de las leyes o los reglamentos que se le encomendó administrar; o actuó de manera irrazonable, arbitraria o ilegal, al realizar determinaciones carentes de una base racional; o si la actuación lesionó derechos constitucionales fundamentales, la deferencia debida a la agencia debe ceder[14].

Si una parte afectada por un dictamen administrativo impugna las determinaciones de hecho, esta tiene la obligación de derrotar con suficiente evidencia, que la determinación no está justificada por una evaluación justa del peso de la prueba que tuvo ante su consideración[15]. De no identificarse y demostrarse esa otra prueba en el expediente administrativo, las determinaciones de hechos deben sostenerse por el tribunal revisor, pues el recurrente no ha logrado rebatir la presunción de corrección o legalidad[16].

Sobre las determinaciones de derecho, el Tribunal Supremo ha dicho que distinto a las determinaciones de hecho, el tribunal las puede revisar en todos sus aspectos, sin sujeción a norma o criterio alguno[17]. Sin embargo, esto no quiere decir que un foro apelativo pueda descartar las conclusiones y sustituir el criterio del ente administrativo por el suyo. En estos casos, también los tribunales apelativos les deben deferencia a los organismos administrativos[18].

**-B-**

De conformidad con la política pública consagrada en nuestra Constitución, se creó el Departamento de Corrección y Rehabilitación como el organismo responsable de implementar

---

[14] *OEG v. Martínez Giraud, supra*, pág. 90; *Super Asphalt v. AFI y otro, supra*, pág. 819, citando a *Torres Rivera v. Policía de PR, supra*, pág. 628; *IFCO Recycling v. Aut. Desp. Sólidos*, 184 DPR 712, 744-745 (2012).

[15] *González Segarra et al. v. CFSE, supra*, pág. 277; *Batista, Nobbe v. Jta. Directores*, 185 DPR 206, 216-217 (2012); *Pereira Suárez v. Jta. Dir Cond.*, 182 DPR 485, 511 (2011).

[16] *González Segarra et al. v. CFSE, supra*; *Pereira Suárez v. Jta. Dir Cond., supra*, pág. 513, citando a *Domínguez v. Caguas Expressway Motors, Inc.*, 148 DPR 387, 398 (1999); *O.E.G. v. Rodríguez*, 159 DPR 98, 118 (2003).

[17] *Vázquez v. Consejo de Titulares y Junta de Directores del Condominio Los Corales, supra*.

[18] *González Segarra et al. v. CFSE, supra*, págs. 277-278; *Batista, Nobbe v. Jta. Directores, supra*, pág. 217, citando a *Rebollo v. Yiyi Motors, supra*.

aquellos asuntos relacionados con el sistema correccional[19].

Cónsono con este imperativo constitucional, en función de mantener un sistema correccional eficaz y a los fines de reglamentar los asuntos relacionados con la clasificación y custodia de un confinado fue aprobado el *Manual para la Clasificación de los Confinados*, Núm. 9151, Departamento de Corrección y Rehabilitación, 22 de enero de 2020 (Reglamento Núm. 9151 o Manual de Clasificación). El estatuto reglamentario se estableció con el propósito de implementar "un sistema organizado para ingresar, procesar y asignar a los confinados en instituciones y programas de adultos del Departamento de Corrección y Rehabilitación (DCR). La clasificación adecuada de los confinados contribuirá favorablemente a la planificación, tanto a corto como a largo plazo, se provee la información necesaria para lograr eficacia en la administración, investigación y preparación de presupuestos"[20].

Para ello, el Reglamento Núm. 9151, *supra*, ofrece las siguientes definiciones sobre los niveles de custodia de los confinados:

> Custodia máxima: Confinados de la población general que requieren un grado alto de control y supervisión. A estos individuos se les puede restringir de determinadas asignaciones de trabajo y de celda, así como de determinadas áreas dentro de la institución, según se estime necesario por razones de seguridad. Se requerirán por lo menos dos oficiales correccionales como escolta para realizar viajes de rutina o de emergencia fuera de la institución. Se utilizarán esposas, cadenas y grilletes en todo momento mientras los confinados de custodia máxima se encuentren fuera del perímetro de seguridad (la verja o el muro). Estos confinados estarán en celdas y no en dormitorios. Esto no limita la participación del confinado en los programas y servicios. Contarán con un período mínimo de dos (2) horas diarias de recreación física al aire libre, según lo permitan las condiciones climáticas.

> Custodia mediana: Confinados de la población general que requieren un grado intermedio de supervisión. Estos confinados son asignados a celdas o dormitorios y son elegibles para ser asignados a cualquier labor o actividad que requiera supervisión de rutina dentro del perímetro de

---

[19] Artículo VI, Sec. 19, Const. ELA, LPRA Tomo 1, ed. 2016, pág. 455; Artículo 4 de la Ley Núm. 2-2011, denominado como Plan de Reorganización de 2011, 3 LPRA Ap. XVIII sec. 4.
[20] Artículo II del Manual de Clasificación.

seguridad de la institución. Se requiere de dos oficiales correccionales como escolta para realizar viajes, ya sean de rutina o de emergencia, fuera de la institución, y se utilizarán esposas con cadenas en todo momento. A discreción de los oficiales de escolta, se podrán utilizar otros implementos de restricción.

Custodia mínima: Confinados de la población general que son elegibles para habitar en viviendas de menor seguridad y que pueden trabajar fuera del perímetro con un mínimo de supervisión. Estos confinados son elegibles para los programas de trabajo y actividades en la comunidad compatibles con los requisitos normativos. Estos individuos pueden hacer viajes de rutina o de emergencia fuera de la Institución sin escolta, cuando tengan un pase autorizado, y pueden ser escoltados sin implementos de restricción[21].

A tales fines, el Manual de Clasificación creó el Comité de Clasificación y Tratamiento y define el mismo como el organismo responsable de evaluar las necesidades de seguridad y de programas de los confinados sentenciados[22].

Para realizar las reclasificaciones periódicas, se sigue el proceso establecido en la Sec. 7 del Manual de Clasificación, y se utiliza el *Formulario de Reclasificación de Custodia[23]*. No obstante, la reevaluación de custodia no necesariamente resultará en un cambio en la clasificación de custodia o la vivienda asignada. Su función primordial es verificar la adaptación del confinado y prestarle atención a cualquier situación que pueda surgir[24].

Mientras, el nivel de custodia se determinará empíricamente a través de un instrumento de medición conocido como *Formulario de Reclasificación de Custodia* (Formulario de Reclasificación)[25]. Luego de evaluar ciertos factores objetivos, el nivel de custodia que designará se hará conforme a la siguiente escala: Mínima = 5 puntos o menos; Mediana = 5 puntos o menos si el confinado tiene una orden de detención, de arresto, de violación de libertad bajo palabra o de probatoria; Mediana = 6-10 puntos; Máxima = 7 puntos o más

---

[21] Art. IV, Sec. 1, del Manual Núm. 9151.
[22] Sec. I del Manual de Clasificación.
[23] Apéndice K del Manual de Clasificación.
[24] Art. IV, Sec. 7, del Manual de Clasificación.
[25] Formulario de Reclasificación de Custodia, Apéndice K del Manual de Clasificación.

en los renglones 1-3; Máxima = 11 puntos o más en los renglones 1-9.

La escala de evaluación para determinar el grupo en el que se ubicará al confinado está basada en criterios objetivos a los que se asigna una ponderación numérica fija. Así, mientras más alta es la puntuación en la escala, mayor es el nivel de custodia que necesita el confinado[26].

Los criterios objetivos que el Comité evaluará en el proceso de reclasificación de custodia del confinado serán los siguientes: (1) la gravedad de los cargos y sentencias actuales; (2) historial de delitos graves previos; (3) historial de fuga; (4) número de acciones disciplinarias; (5) acciones disciplinarias previas serias; (6) sentencias anteriores por delitos graves como adulto; (7) participación en programas y tratamiento; y (8) la edad del confinado. A cada criterio descrito se le asigna una puntuación en la plantilla de evaluación que se sumará o restará según corresponda a la experiencia delictiva del confinado. El resultado de estos cómputos establece el grado de custodia que debe asignarse objetivamente al evaluado[27].

El Formulario de Clasificación también le provee al evaluador algunos criterios adicionales, discrecionales y no discrecionales, para determinar el grado de custodia que finalmente recomendará para determinado confinado o confinada.

Nuestro más Alto Foro, ha reconocido que la determinación administrativa sobre el nivel de custodia de los confinados requiere efectuar un adecuado balance de intereses[28]. En un lado, está el interés público de lograr la rehabilitación de la persona confinada y el interés en la seguridad de la institución y de la población penal y

---

[26] *López Borges v. Adm. de Corrección,* 185 DPR 603,609 (2012).
[27] Formulario de Reclasificación de Custodia, Apéndice K del Manual de Clasificación, *supra.*
[28] *Cruz v. Administración,* 164 DPR 341, 352 (2005).

al otro, estará el interés de la persona confinada particular de permanecer en determinado nivel de custodia[29]. El interés público en la rehabilitación de la población penal y en la seguridad institucional debe prevalecer sobre el interés particular del confinado en permanecer en un nivel de custodia-en específico o en determinada institución penal[30]. Dado que, precisa el sopesar una serie de factores, la determinación sobre la procedencia de un cambio de custodia requiere la pericia de Corrección[31].

El Comité de Clasificación de la División Central de Clasificación está compuesto por peritos, técnicos sociopenales, oficiales o consejeros correccionales que cuentan con la capacidad, conocimiento y experiencia necesaria para atender las necesidades del confinado y realizar este tipo de evaluación[32]. Es por ello que, salvo que sea arbitraria, caprichosa o no esté sustentada por evidencia sustancial, su determinación debe sostenerse[33]. Mientras que "la decisión sea razonable, cumpla con el procedimiento establecido en las reglas y los manuales, y no altere los términos de la sentencia impuesta, el tribunal deberá confirmarla"[34]. Nuestro Tribunal Supremo ha puntualizado que la norma de deferencia a la determinación administrativa cobra aún más importancia en las decisiones que toma Corrección sobre los niveles de custodia de los confinados[35].

Tal deferencia se apoya, además, en el hecho de que los procesos administrativos y las decisiones de las agencias están investidos de una presunción de regularidad y corrección[36]. Esta

---

[29] *Íd.*
[30] *Íd.*, pág. 354.
[31] *Íd.*
[32] *Cruz v. Administración, supra.*
[33] *Íd.*
[34] *Íd.*
[35] *Íd.*
[36] *García Reyes v. Cruz Auto Corp.*, 173 DPR 870 (2008); *Otero v. Toyota*, 163 DPR 716 (2005); *Rivera Concepción v. A.R.P.E.*, 152 DPR 116 (2000).

presunción debe ser respetada mientras la parte que las impugne no produzca suficiente evidencia para derrotarlas[37].

Sin embargo, las determinaciones de los organismos administrativos no gozan de tal deferencia cuando estos actúan de manera arbitraria, ilegal, irrazonable o cuando la determinación no se sostiene por prueba sustancial existente en la totalidad del expediente[38]. En armonía con lo previamente enunciado, debemos limitarnos a analizar si Corrección actuó en contravención a su ley habilitadora, de forma arbitraria o ilegal, o en forma tan irrazonable que su actuación constituye un abuso de discreción[39].

### III.

En esencia, el señor Villanueva González alegó en su recurso de *Revisión Administrativa* que el DCR incidió al ratificar su permanencia en custodia máxima. No le asiste la razón, veamos.

Se desprende del expediente ante nuestra consideración que, al aplicar la escala de reclasificación de casos sentenciados, arroja una puntuación correspondiente a custodia mínima. No obstante, como adelantamos en la exposición de derecho, se pueden acoger modificaciones discrecionales. En el caso de autos, el Comité de Clasificación y Tratamiento acogió modificaciones discrecionales para otorgar un nivel de custodia más alto por el historial de violencia excesiva y desobediencia de las normas por parte del recurrente.

Según surge de la *Resolución de Hecho y Derecho*, el señor Villanueva González cumple sentencia por delitos de asesinato en primer grado, tentativa de asesinato en primer grado y ley de armas. El DCR puntualizó que, si bien el señor Villanueva González completó terapias y certificaciones, éste no ha mostrado

---

[37] *Rivera Concepción v. A.R.P.E., supra.*
[38] *O.E.G. v. Rodríguez,* 159 DPR 98 (2003).
[39] *Comisión Ciudadanos v. G.P. Real Property,* 173 DPR 998 (2008).

arrepentimiento a siete (7) años, dos (2) meses y siete (7) días que lleva privado de su libertad; lo cual demuestra que no ha hecho introspección sobre el delito por el que cumple sentencia. Por ende, el recurrido entendió que, dado el hecho de que el recurrente no ha reconocido la comisión del delito por el cual cumple, no ha dado el primer paso a la rehabilitación. Asimismo, el recurrido concluyó que el señor Villanueva González resulta un ciudadano en completo desdén y nocivo para la comunidad en general.

Por otro lado, es menester recalcar que el DCR puntualizó que, si bien es cierto que, durante el periodo evaluado el recurrente no ha incurrido en nuevos actos de indisciplina, no podían obviar que durante el confinamiento ha incurrido en desobediencia ante las normas, esto incluye actos de indisciplina relacionados a agresión, así como tentativa y posesión de un teléfono celular. Lo cual demuestra que no está preparado para una convivencia con menores restricciones.

A la luz de lo antes expuesto, reafirmamos la deferencia que merecen las determinaciones del Comité de Clasificación y Tratamiento, pues están sustentadas en la pericia técnica de sus integrantes y cobijadas por una presunción de regularidad y corrección. En el presente caso, dicha pericia permite discernir que el confinado aún no se encuentra preparado para integrarse a un régimen de menores restricciones físicas. Lejos de constituir una actuación arbitraria o caprichosa, la evaluación impugnada se fundamenta exclusivamente en la información contenida en el expediente del señor Villanueva González, del cual fue considerado integralmente su historial institucional.

### IV.

Por los fundamentos que anteceden, ***confirmamos*** la *Resolución de Hecho y Derecho* recurrida.

Notifíquese.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones